## MAY DEPARTMENT STORES CO. v. PAOLUCCI.

### No. 8425.

Circuit Court of Appeals, Sixth Circuit.

June 5, 1941.

James P. Hume, of Chicago, Ill. (Cyril A. Soans, of Chicago, Ill., on the brief), for appellant.

David Perris, of Cleveland, Ohio, for appellee.

Before HICKS, SIMONS, and HAMILTON, Circuit Judges.

HICKS, Circuit Judge.

Suit by Vincent Paolucci, appellee, against The May Department Stores Company, appellant, for infringement of Patent No. 2,025,304 December 24, 1935, for an "Undergarment." There were several defenses, which we think have been narrowed here to the question of infringement. The District Court found the patent valid and infringed. All eight of the claims are involved.

It appears from the description that the "invention relates to men's garments such as union suits, bathing suits, and drawers. It is one of the objects of the invention to provide a garment having as an integral part thereof an improved form of suspensory that is so designed and built into the garment as to efficiently accomplish the purposes of a suspensory and afford a maximum of comfort to the wearer. * * * A garment constructed as * * * described and illustrated provides a hammock-shaped suspensory which is capable of taking the shape indicated * * * and the arrangement of the various pleats, as described, provides the necessary fullness to permit the crotch portion to adapt itself to the wearer so as to efficiently accomplish the purposes of a suspensory, and, at the same time, give comfort to the wearer."

It is difficult to visualize the garment from the description, even with the aid of drawings; but its novel cut is made clear by the physical exhibits. The garment described and exhibited is of the type of men's shorts with legs and a vertical opening at the front with overlapping side portions secured by buttons. The novelty, if any, lies in the arrangement of the crotch portion, described as "hammock-shaped," to support the genitals. The support provided is an open, shallow pouch, longer from front to back and higher at the sides and at the front end than at the center. This hammock-shape is an integral part of the garment and is made possible by the provision of an extra fullness in the seat piece,

and by an extra fullness and a novel shape in the front pieces, which latter are folded and secured at the front of the garment to produce the desired shape. The seat piece, both in the pattern and in the garment, is not distinguished from conventional types except for the extra width, particularly toward the front, and especially at the line of attachment with the front pieces.

The front pieces in the pattern are wedge-shaped with their wider ends at the top, where in the garment they fasten to the top or belt pieces. The outer edges are practically straight and in the garment their seams with the front edges of the two leg portions converge downwardly. The leg portions encircle the leg, being seamed at the top to the belt piece, and then extend in a practically continuous seam, along the outer edges of the front pieces and seat panel, from the front through the crotch to the back and up to the belt piece again at the rear. However, the inner edges of the front pieces in the pattern are not continuous, the top portion being offset from the lower portion, the two being connected by a quarter-circular curve. In the garment, when the front pieces are sewed together along the quarter-circular curves a "right angle" is produced, the one half of which is roughly vertical and in the plane of the front of the garment, and the other, roughly horizontal and in the plane and forming the center, of the front of the "Hammock-Shaped" portion heretofore mentioned. The apex of the "angle" thus formed is "at the middle of the front of the garment" and is designated "18" on the drawings and on the marked exhibit. The remaining fullness in the lower ends of the front pieces runs in each case from point "18" and from points in each leg seam on a horizontal level with point "18," which points we shall call "1" and "1'," to points a couple of inches or so higher in each leg seam, which we shall call "h" and "h'."

Thus, four folds are formed on each side of point "18"—(1) a fold running horizontally from "18" to the leg seam at "1"; (2) one sewed into the leg seam from "1" up to "h"; (3) one called a "pleat" in the specification running upwardly at an angle from "18" to "h" in the leg seam; and (4) one running from "h" in the leg seam backward through the seat piece and merging with, and disappearing in, the upward curve in the back part of the seat piece. Each of the folds comes in pairs, each having its counterpart opposite the middle point "18."

The paired folds or "pleats" (3) extending from "h" in one leg seam down through point "18" and up to "h'" in the other leg seam, form the front of the "hammock-shaped" crotch portion. The sides thereof are formed respectively by folds (4) running from "h" and "h'" in the respective leg seams backward through the seat piece to the rear of the garment. Fold (4) because of the fullness we have spoken of, lies between the middle of the garment, and the inner and lower, horizontal section of the leg seam. Thus fold (4) and not the leg seam, as in a garment we shall mention later, tends to fit into the groin of the wearer. The front sections of the two leg seams diverge widely from points "1" and "1'" to their fastenings in the belt portion.

Appellee testified that before 1930, when he commenced to work on his garment, it was the practice to make suspensories separate from the garment, with a bag and a lot of strings and a belt, which he declared was not desirable; but the patent to Rivkin No. 1,701,933, February 12, 1929, provided a bathing and gymnasium suit, "which is capable of serving the purpose also of a jock strap," with the front "strap" curved artificially where it joined the seat piece "to give fullness, to form a partial pocket or bag the more effectively to accomplish its purpose." In Rivkin the leg openings were slashed "diagonally outwardly and upwardly so that the binding of the diagonal leg edges against the legs of the wearer" will draw up and support the sides of the pouch portion. In Rivkin, owing to the cut of the garment, the support of the crotch portion derived not from the belt piece, as in Paolucci, but primarily from the tension on the outside of the legs.

But on January 26, 1932, before Paolucci applied for his patent, Letters Patent (No. 1,842,472) issued to Firsching for another "undergarment of such design and shape that when in position on the wearer, it will itself form a suspensory bandage so that the single garment will serve the purpose of the ordinary undergarment and will also function as a suspensory. * *" This garment used a single front piece with opening at the side in the line of the front leg seam on that side. The crotch portion was composed of triangular-shaped front, and rear (or seat) members, each of which had one edge convex at the center and concave at each end. When these curved edges were joined, a hammock-

shaped pocket was produced which in front and cross section greatly resembled appellee's hammock-shaped portion. However, in appellee's garment the suspensory portion was anchored in the three frontal seams which fastened to the top piece, namely, the two widely diverging leg seams and the middle seam between the two front pieces, the weight on the latter being carried to the belt piece through the reinforcement in each front piece along the fly. In Firsching, the suspensory portion was supported at one point only and without any reinforcing seam or doubling of the fabric, at the apex of the triangular front piece where it attached to the belt portion. The sides of the "hammock" were self-supporting owing to the way the front and rear pieces were cut along the line of junction.

In Rivkin the side drag of the "pouch" was carried not by the belt portion but by the outside of the legs of the wearer. There was no center support except in the inherent strength of the fabric.

In his specifications appellee states that he is not limited by the described means and cut, but that "it will be understood that the various parts of the garment may be otherwise cut and sewn together to produce substantially the same construction and results without departing from the spirit of my invention as defined in the appended claims." Be that as it may, the scope of his invention must be greatly limited by the garments, combining a suspensory, which were already in the art. Appellee's garment was not the first combined suspensory and undergarment but it was the first in which significance was attached to the middle support and it was the first to use folds to give fullness. Rivkin and Firsching on the other hand used the curved seams between the front and seat portions of the crotch panel to produce fullness where needed.

The forerunners of the accused garment were two patented garments which throw further light on the state of the art. The first of these was covered by Patent No. 2,012,879, August 27, 1935, to Kneibler. This was a combined garment and jock strap of very simple construction. It was of knitted material with an elastic web at the top, a narrow, almost straight front piece, two narrow side pieces, and a wide back piece which joined the front in the crotch in a straight seam. The leg openings were slashed diagonally and upwardly as in Rivkin, and the hems thereof were fitted with elastic in the (outer) portions so that when the garment was worn the inner portions were maintained taut and in the groins of the wearer. The hem of this garment, which corresponds to the seam between the leg and seat piece in the accused garment, and not the simple cloth fold (4) of Paolucci, fitted into the groin of the wearer.

The second patent to Kneibler, No. 2,019,140, October 29, 1935, was adapted from Patent No. 2,102,879, to provide a fly-closed front opening. This was attained by shortening and pointing the front piece so that it terminated a few inches below the waistband. The side pieces were widened to make up for the change in shape, meeting in front above the front piece. The left side piece was sewed to the front piece along its pointed side, and the right lapped underneath the front piece without a seam to provide a fly opening. The seam structure of this garment had the appearance of an inverted "Y" at the front, and was known as the "Y Front" garment.

The accused garment, roughly speaking, was the "Y front" garment, with legs. It contained the fly, and the pointed front piece which was lengthened to provide a longer fly opening. The garment was altered however in that the leg pieces, instead of attaching to the leg hems of the old garment, were lengthened, and the side and rear pieces narrowed so that the leg pieces were fastened to the elastic belt piece at the top. The seams, then, which joined the leg pieces to the side, front and rear pieces, extended from the belt down the front, through the crotch where they apparently fitted into the groin, and up the back piece to the belt again. Appellant's witness, Frederickson, testified that this design was a "trifle short through the center portion"; that he experimented with three or four garments to give more room there, that is, for the genitals.

In one of these experimental garments he used darts in the sides of the crotch portion to draw in the sides, which was the device used in Gingrich, a patent in the prior art. In another, a triangular piece was cut out at the sides of the crotch piece and the edges sewed together, and as Frederickson testified, "The seams serve its purpose, as far as the pouch was concerned, but was more or less objectionable on account of the roughness of the seam and splitting edges."

The solution adopted was a double fold, or pleat, across the lower part of the front piece, the ends of which were sewed into the seam joining the front and leg pieces. Frederickson testified that this "particular tuck was much cheaper and simpler to produce" since "the distance between the two points" (that is, across the front piece) "was so short that in producing and manufacturing it was cheaper to have the operator run directly across joining both of them at one time, saving steps, cost us less; that is, cost less in labor to produce."

In use, the resilience of appellant's knitted fabric was such that the center of the pleat pouched out, being held in at the edges by the seaming. This simple double fold or pleat, running horizontally across the lower part of the front piece, and sewed at its ends into the seam joining the front and leg pieces, appellee claims, infringes the complicated folds of his patent.

■ The District Court expressed some doubt about the utility of appellee's patent, but, yielding to the presumption of validity arising from the grant, held it valid. However, the court was of the opinion that it "should be held to very narrow limits." In this respect we concur in the court's conclusion.

■ We have no hesitancy in adopting the rule that the claims of the patent measure its validity, and in invoking a literal reading thereof. Directoplate Corp. v. Donaldson Lithographing Co., 6 Cir., 51 F. 2d 199, 202; Goodrich v. Ford Motor Co., 6 Cir., 97 F.2d 427, 430; Monarch Marking Systems Co. v. Dennison Mfg. Co., 6 Cir., 92 F.2d 90, 97.

■ The first seven claims, of which claim 1 is typical,[1] are not infringed because each calls for an undergarment with a hammock-shaped crotch portion, the *forward part or edge of which is attached at its middle to the front of the garment*. If appellant's crotch portion can be described as hammock-shaped, a debatable question, its forward edge or part is *not* attached to the middle of the garment. The middle of appellant's garment is not fastened at all but protrudes as needed; and that it be free to do so, is important.

Claim 8 is vague. It reads as follows: "8. An undergarment comprising a crotch portion which is substantially hammock-shaped and has its forward portion folded and the lateral edges of said folded portion sewed to the front of the garment, and the front of the garment being folded so as to form with said folded crotch portion pleats on opposite sides of the middle of the crotch portion to provide fullness in the forward part of the crotch portion between the middle and said sewed portions of the lateral edges."

Analyzed, it is apparent that this claim is concerned with two sets of folds. About midway thereof it speaks of the "front of the garment being folded" (this of course occurs in appellant) "so as to form *with* said *folded crotch* portion pleats, etc." (Italics ours.) We are not aided by appellee's briefs in applying this claim to appellant's construction. We do not know whether he ascribes the term "front portion" or "crotch portion" to appellant's folded portion, but whichever is intended, it is apparent that appellant does not have a folded front portion and a folded crotch portion. It has one or the other but not both. It is structurally impossible to apply that part of Claim 8 reading, "and the *front* of the garment *being folded* so as to form *with* said *folded crotch portion* pleats, etc." (Italics ours.)

We find no infringement of any of the claims and the decree is therefore reversed with directions to enter a decree in accordance with this opinion.

---

[1] "1. An undergarment comprising a crotch portion which is substantially hammock-shaped and has its forward part attached at the middle thereof to the front of the garment, said crotch portion being provided with folds at the edges thereof which extend from front toward the back and with the forward ends of said edges attached to the front of the garment at points which are relatively widely separated and substantially higher on the front of the garment than the point of attachment of the middle of said crotch portion, and the forward part of said crotch portion being provided with loose folds between said points of attachment."